ORIGINAL

**IN THE UNITED STATES COURT OF FEDERAL CLAIMS**

**RONALD ADAMS CONTRACTOR, INC.** **PLAINTIFF** 03-2771C

**VS.** **CAUSE NO.** ______________

**THE UNITED STATES OF AMERICA** **DEFENDANT**

FILED
DEC - 3 2003
U.S. COURT OF FEDERAL CLAIMS

**COMPLAINT**

Ronald Adams Contractor, Inc. ("Ronald Adams"), Plaintiff, presents the following Complaint against the United States of America, Defendant, and for its causes of action, Ronald Adams would show the Court the following:

1.

Ronald Adams is a corporation organized and existing pursuant to the laws of the State of Louisiana, having its principal place of business in Thibodaux, Louisiana.

2.

The United States of America ("the United States"), Defendant, is a governmental agency which, at all times relevant to this case, acted by and through the United States Army Corps of Engineers, New Orleans, Louisiana District ("the Corps").

3.

On or about August 25, 1997, Ronald Adams entered into a contract with the Corps ("the Contract") whereby Ronald Adams was to construct certain hurricane protection levees along the Westwego to Harvey Canal in Louisiana, which project was known as "Westwego to Harvey Canal, Hurricane Protection Levee, Orleans Village to Highway 45, First Enlargement" being Contract No. DACW29-97-C-0086) (hereinafter "the Project").

4.

The Contract between Ronald Adams and the Corps incorporated plans, specifications, and bid documents prepared and issued by the Corps. Copies of the Contract, plans, specifications, and bid documents are too voluminous for attachment hereto, but are in the possession of the Corps and are incorporated herein by reference.

5.

In preparing its bid for the Project, Ronald Adams relied upon the accuracy and completeness of the plans, specifications and bid documents. Ronald Adams prepared and submitted its bid to construct the Project based upon the accuracy and completeness of the plans, specifications and bid documents prepared and issued by the Corps. Ronald Adams based its bid price upon its ability to construct the Project in strict compliance with the plans, specifications and bid documents.

6.

During construction, it became obvious that the plans, specifications, and bid documents issued by the Corps, and upon which Ronald Adams based its bid price, were defective, incomplete, inadequate and insufficient for proper construction of the Project. As such, the Corps breached its implied warranty to Ronald Adams that the plans and specifications, when followed, would produce the desired result.

7.

During construction, Ronald Adams encountered unforeseen subsurface conditions during the course of the Project which differed materially from those represented in the plans and specifications, and differed materially from those normally encountered and generally recognized as inherent in the work set forth in the plans and specifications.

8.

During construction, while recognizing that Ronald Adams had encountered unexpected site conditions, the Corps failed to compensate Ronald Adams for the increased costs and impacts caused by the differing site conditions.

9.

The wrongful acts and omissions of the Corps in failing to recognize or compensate Ronald Adams' increased costs and impacts for the differing site conditions include, but are not limited to, the following:

(a) failing to issue plans, specifications and bid documents which showed that the top four (4) to six (6) feet of the soil of the borrow pit areas of the Project was humus material;

(b) failing to issue plans, specifications and bid documents which showed that the top four (4) to six (6) feet of soil throughout most areas of the Project was humus material;

(c) issuing plans, specifications and bid documents which incorrectly showed clay soil in the borrow pit areas of the Project and no humus;

(d) issuing plans, specifications and bid documents which incorrectly showed clay soil in all areas of the Project and no humus; and

(e) failing to adequately address the differing site conditions outlined in subparts (a) through (d) during construction.

10.

On September 14 and on September 21, 2000, Ronald Adams submitted its claim to the Corps for the damages caused by the acts and omissions of the Corps as set forth above. A copy of Ronald Adams' claim submitted to the Corps as set forth in the September 14 and September 21 letters is attached hereto as Exhibit "A". (The exhibits to the September 14, 2000 letter are too voluminous for attachment, but are in the possession of the Corps and re incorporated herein by reference). On

December 7, 2000, Ronald Adams certified its claim to the Corps after receiving no response from the Corps to its September 14 and 21, 2000 submissions. A copy of Ronald Adams' December 7, 2000 letter and claim certification are attached hereto as Exhibit "B".

11.

In its December 7, 2000 letter to the Corps, Ronald Adams requested a Final Contracting Officer's Decision. However, Ronald Adams has still not received a Final Contracting Officer's Decision. This action has been timely brought, as the Corps has had ample time to issue a decision on Ronald Adams' claim and has failed to do so.

12.

The site conditions described above amount to both a Type I and a Type II differing site condition. The acts and omissions of the Corps as set forth above amount to a wrongful failure by the Corps to compensate Ronald Adams under the Differing Site Conditions Clause of the Contract.

13.

As a direct and proximate result of the Corps' failure to compensate Ronald Adams under the Differing Site Conditions Clause of the Contract, Ronald Adams has incurred substantial damages as hereinafter set forth.

14.

Ronald Adams has been damaged by the differing site condition in a number of ways, including, but not limited to, the following:

(a) Ronald Adams was forced to engage in excess dewatering at the start of the project, due to the presence of humus material;

(b) Ronald Adams incurred increased maintenance of drainage ditches due to the presence of humus material;

(c) Ronald Adams encountered subsidence and high maintenance of perimeter dikes which were caused by the presence of humus material;

(d) Ronald Adams was forced to engage in the chipping of trees and underbrush due to its inability to gain access to the site with normal construction equipment for clearing and due to the presence of humus material;

(e) Ronald Adams was forced to construct board haul roads in some areas, because the surface in some work areas was too soft to support excavation and haul equipment due to the presence of humus material;

(f) Ronald Adams was forced to use triple mats to support the draglines due to the presence of humus material;

(g) Ronald Adams was forced to use special excavation and haul equipment due to the presence of humus material;

(h) Ronald Adams incurred increased excavation costs because it was required to remove humus material to gain access to suitable material;

(i) Ronald Adams was forced to spend much more time on the Project than anticipated at the time of its bid, because of the time it lost in overcoming the effects of the humus material; and

(j) Ronald Adams was not paid for the removal of humus material.

DAMAGES

WHEREFORE, PREMISES CONSIDERED, Ronald Adams demands judgment of and from the United States as follows:

(a) Compensatory damages in the amount of $2,404,685.53;

(b) Interest pursuant to the Contracts Disputes Act from and after December 7, 2000;

and

(c) All attorney's fees, consulting costs and all other costs incurred by Ronald Adams in the preparation of the claim and in the prosecution of this action, pursuant to 5 U.S.C. § 504 and 28 U.S.C. § 2412.

Respectfully submitted,

RONALD ADAMS CONTRACTOR, INC.

BY: ______________________________
PHIL B. ABERNETHY (MSB #1023)
RICHARD M. DYE (MSB #99147)
POST OFFICE BOX 22567
JACKSON, MS 39225-2567
(601) 985-4536

ITS ATTORNEYS

OF COUNSEL:

Butler, Snow, O'Mara, Steven & Cannada, PLLC
17th Floor, AmSouth Plaza
210 East Capitol Street
Jackson, MS 39201
Telephone: 601-948-5711
Facsimile: 601-985-4500

JACKSON 819055v1

**Ronald Adams**
CONTRACTOR, INC., L.L.C.

1074 HIGHWAY ONE
THIBODAUX, LOUISIANA 70301
PHONE (985) 447-4466
FAX (985) 447-4546
LA Contractor's License No. 8579

Department of the Army
New Orleans District Corps of Engineers
P.O. Box 60267
New Orleans, La. 70160-0267

September 14, 2000

Attention: Mr. Chester Ashley

Re: Contract No. DACW29-97-C-0086
Westwego to Harvey Canal
Hurricane Protection Levee
Orleans Village to Hwy 45
First Enlargement
Unsuitable Material (humus)

Gentlemen;

During the course of the work we encountered throughout the project material of a highly organic nature which was unsuitable for incorporating into the work. Initially we thought that this material existed only at the surface and was confined to only one location on the project. Based on this belief we requested permission to be allowed to waste this material. Later we discovered that this material existed throughout the project and that its depth ranged from a few inches to six feet. Accordingly, we notified the Corps that we believed that we had encountered different site conditions and after some discussion hired a soils consultant to carry out soil borings to determine the true character of the material. These investigations confirmed that the soils present at the site are different from that shown on the soil borings logs contained in the contract. They differ substantially in that majority of the site is overlaid with a thick layer of highly organic material which would not readily support the construction equipment.[1] This material is not shown on the contract soil borings.[2]

The presence of humus material made it difficult for us to de-water the site and to move heavy equipment around the site and, as a result, the project progress of clearing and grubbing as well as borrow pit preparation was delayed. In May 1998 after almost 260 days of work attempting to drain and prepare the borrow areas, the Corps issued a directive noting that the project was delayed and requiring us to regain the original construction schedule. In its letter,

---

[1] See Soil Testing Engineers report contained in Exhibit 2 (page 6).

[2] See Exhibit 14 (page 115) excerpts of COE Soil Boring Charts.

ALL-STATE LEGAL® EXHIBIT "A"

the Corps noted that the Clearing and Grubbing operations were 30% behind schedule and that Embankment operations were15% behind schedule.[3] Taking into consideration that the notice to proceed was issued on August 25, 1997 and the contract duration was fixed at 512 calendar days, a 30% delay meant that the project was significantly delayed. Consequently, the directive to recover the schedule meant that it would be necessary for us to accelerate the work. In our letter of May 22, 1998, we prepared an alternative construction plan which required us to mobilize marsh-buggy excavators and additional off road trucks to achieve this acceleration. In this way, we would be able to deal with the thick layer of humus material which covered the site and thereby regain some of the delay which we had thus far experienced. This plan was transmitted to the Corps by our letter of May 22, 1998.[4]

The change in equipment as reflected in our letter of May 22, 1998 compared with our original Borrow Excavation Plan[5] demonstrates the difficulty which we had already experienced on the site. As a result, the work would be performed by a larger number of excavators than planned, many of which would be mounted on marsh-buggies, and by an increased number of off road trucks. These changes were necessary because the soft underlying humus material would not support the planned method of excavation nor would it be possible to transport material from the borrow to the levee without the extensive use of off road trucks. Later, in some areas, even these off road trucks would not be able to move the material without the use of board roads. Thus, the presence of the thick layer of humus material substantially changed both the method and manner by which the project could be performed.

The presence of such large quantities of humus material was unforseen when we bid the project. The drawings which were provided by the Corps depicted the type of material we expected to encounter and this is shown on drawings DACW29-97-B-0300 sheets 21 through 25 of 26. On these drawings only one soil boring shows the presence of humus material and this boring is outside of any borrow area near Cell 5 at the levee. Of the nearly seventy soil borings provided by the Corps only boring OC-9 indicates the presence of humus material.

In the Unified Soil Classification legend the presence of organic material in clay is represented by the letters "OH" and given with a symbol of solid and dashed diagonals lines. It is grouped just above the symbol for Highly Organic Soils. The soils in the OH groups are characterized by the presence of organic matter, hence the symbol "O". On the drawings provided by the Corps none of the soil borings indicate the presence of either OH or OL soil at

---

[3] See Corps letter dated May 11, 1998 contained in Exhibit 3 (page 75).

[4] See RACI letter dated May 22, 1998 contained in Exhibit 4 (page 76).

[5] See RACI Borrow Excavation Plan dated December 31, 1997 in Exhibit 5(page 81).

or near the surface.

For these reasons, it was not expected by us when we entered the site to find the presence of humus or organic material at the surface of the borrow areas. In fact , what was expected was what was indicated on the Corps' drawings, that is, soil material classified as "CH" or fat clays. None of this material was found at the surface as indicated on the contract soil borings. Instead, we found highly organic material at the surface and in some cases, up to six feet deep.

Obviously, it is quite difficult to de-water soil which contains so much humus material and as a consequence the clearing and grubbing operations were extended, both because of the difficulty to access the clearing and because of the increased time required to de-water the soil so that clearing could begin. Thus, it is not surprising that the Corps issued its notice that the project was delayed.

On May 28, 1998 we notified the Corps that we had come to the conclusion that the borrow areas contained humus material and that it would be necessary for us to modify our excavation plan in order to accommodate our hauling operations.[6] In this letter we notified the Corps of the different site condition we had found and requested an extension of time corresponding to the time needed to remove the humus material from the borrow area without payment for either direct or indirect cost for removal of the surface material.

During the preconstruction conference we were requested to notify the Corps of any different site condition found and it was brought to our attention that the conditions of the Contract required us to make notice of any Different Site Conditions found.[7]

In response to our notification of the presence of humus material in the borrow area, the Corps undertook its own investigation of the presence of humus material and issued a contract modification for CIN-01 increasing the contract time by 60 days to provide sufficient time to construct haul roads within the borrow area.[8] The Corps did not, however at this time, consider that the humus material was to be classified as unsuitable but did agree that the conditions were sufficiently different to warrant an extension of time and the waiver of the Liquidated Damages of $1000.00 per day for late completion. At this time, we also did not think that the presence of humus material was very extensive either and therefore were willing to undertake its removal without requesting additional compensation. On July 1, 1998, Eustis Eng took sample humus material in cell 3, 4, 5 at the same time the Corps requested for elevations along the dikes to be

[6] See RACI letter dated May 28, 1998 contained in Exhibit 6 (page 84).

[7] See Minutes of Meeting published by the Corps dated October 17, 1997 in Exhibit 8 (page 89).

[8] See Corps letter dated June 15, 1998 contained in Exhibit 9 (page 94).

taken for record.[9]

In early April 1998 we began to experience significant failures of our dikes and these continued into July 1998. In a meeting held on site on July 20, 1998 we brought to the Corps attention that there was obviously something wrong and requested that the Corps engineering division undertake an analysis of the situation.[10] This was the second notice of Different Site Condition. The report of Eustis Engineers issued in mid July 1998 also confirmed the extensive presence of humus material in cells 3,4, &5.[11] The Corps stated during the meeting that the project was set up as a "cast job" and they never envisioned a contractor hauling the material.

On July 24, 1998 the Corps notified us that they had examined the dike failures in the borrow area and concluded that the failures were caused by the dikes not being built in the location called for on the drawings and by excavation within the borrow having slopes steeper than specified.[12] The Corps gave no explanation as to how the dike construction in a different place could cause the dike to fail nor did they explain why the failures had taken place before excavation work had begun. On July 25 and 29, 1998 we were directed to relocate the dikes to the backside of the right of way. We complied with this directive and gave notice of our intent to claim for the increased cost caused by the directive.[13]

It is important to note that the location of the perimeter dikes was placed in accordance with the contract specifications and this fact is demonstrated by the Corps' "Quality Assurance Report" made as the dikes were constructed. During the months of December 1997 when the dikes were constructed the Corps' project engineer regularly noted on his inspection report "Contractor building perimeter dike for the area at approx. sta.----".[14] There is no indication in these reports that the dikes were being constructed at the wrong location.

Moreover, the dikes continued to fail throughout the project and were repaired on almost a

[9] See RACI daily report of July 1, 1998 contained in Exhibit 10 (page 97).

[10] See Corps' Daily log #84 and RACI letter dated July 22, 1998 contained in Exhibits 11(page 98) & 12 (pages 100).

[11] See Eustis report dated July 14, 1998 contained in Exhibit 13(page 102).

[12] See Corps letter dated July 24, 1998 contained in Exhibit 15(page 122).

[13] See RACI's letter dated August 12, 1998 which again confirmed that the site was situated on unsuitable humus material and that the failure of the dikes was caused by the inability of the material to support the perimeter dike not its location. See Exhibit 16 (page 123).

[14] See Corps "Daily Construction Logs number 23, 28,31 & 32 contained in Exhibit 17(page 125).

continuous basis. We have collected these cost as they were incurred and have included both the cost of relocation as well as the costs of repair as a part of this request for equitable adjustment based upon differing site conditions. Obviously if we would have known about the extent of the humus material on the site we would have included in our price the cost of construction of the dikes on firm material or priced the continuous maintenance. This fact was un-known to us at the time of the bid and therefore was not included in our contract pricing.

As noted above the legend given on the contract drawings give symbols indicating different types of soil which may be encountered according to the Unified Soil Classification categories.[15] These symbols are used in the drawings of the individual soil boring to depict the different types of soils found by the soils engineers when taking the soil borings. The symbol used to indicate the presence of Highly Organic soils is shown as a series of wavy lines. This type of material is called "Humus" material (see COE manual Technical Memorandum No 3-357 page 10, paragraph 16). The symbol given for Organic Clays is a series of alternating diagonal solid and dashed lines. Neither of these symbols are indicated on the contract drawings soil borings nor do the contract drawings indicate the presence of humus material nor highly organic material. The symbol which is used on the contract drawing is a series of **heavy diagonal lines** indicating a "FAT CLAY, inorganic clay of high plasticity" according to the Unified Soil Classification.

The soil sample taken by Eustis Engineers contained in Exhibit 13 (page 103) clearly show the presence of both highly organic soils as well as humus material. In this exhibit we have compared a number of the corresponding contract soil borings with those of Eustis. This comparison confirms that the soil on the site is different from that shown in the soil boring provided with the contract. Soil Testing Engineers also confirms by sample and by site visit and testing that the soils do not conform to what is shown on the contract soil borings.

The soil boring information given on the contract drawings was used by us to determine what type of soil we will encounter when we are performing the project. This allows us to accurately predict the type and duration of each item of equipment needed to perform the various phases of constructing the project from which we derive our estimated cost of the project and thereby our bid to the Corps. In fact our estimate of the site conditions is not much different from that anticipated by the Corps and this fact is revealed in the Corps own estimate of what would be required to perform the project. In Exhibit 18 (page 137) we have included a copy of the Corps estimate which was provided to us through FOIA request. In the calculations for the cost of semicompacted fill and uncompacted fill, the Corps' estimator has used highway tandem dump trucks to haul the material. Considering that dump trucks can only travel on well compacted material when loaded means that the Corps considered that when the site is fully drained and cleared that the existing soil will support normal truck hauling (i.e.; dump trucks). Clearly, then

[15] A copy of this legend is contained in Exhibit 14 (page 114).

the Corps' own examination of the soil borings led them to believe that the surface material was not organic in nature and therefore could be relied upon to support heavy equipment once drained.

We believe that the evidence clearly demonstrates that we have encountered different site conditions and as such we are entitled to an equitable adjustment to our contract following the provisions of the "Change" clause. These different site conditions have affected the manner and means by which we have been able to execute each phase of the project. Its effect not only changed the way we would be able to perform the project it also affected our equipment because it required operation on poorly constructed haul roads which are severe conditions as defined by the Corps Operating Equipment Guide.

In Exhibit 19 (page 184) we have included photographs of our equipment in operation. From these photographs and others it is evident that the excavation and hauling were carried out under severe conditions. We have therefore applied the **severe conditions** to the cost of operating equipment where applicable[16]. It is also obvious from these photographs that with this degree of bogging experienced by off road trucks, it would have been impossible to use normal highway dump trucks for the hauling operation as planned by the Corps estimator.

**Impact on the Project Duration**

In Exhibits 20 (page 189) and 21 (page 190) we have prepared two charts which demonstrate the direct impact of humus removal on borrow pit operations. We have prepared separate graphs because in cells 1, 2 and a part of 3 the humus material was not removed but rather cast by dragline, while in cells 3, 4, 5 and 6 the humus material was first removed before excavation took place. Therefore the impact of the presence of humus material is different for the different borrow pit operations.

In the case of cells 1, 2 and part of 3, the presence of the humus material delayed the start of work as well as the dragline operations. The delay of the start of work was brought about mainly by the extraordinary amount of time needed to remove the water from the humus material. Humus material by nature retains moisture and therefore takes considerable longer to drain. Thus, its presence in the borrow delayed the start of dragline operations. We have determined the delay to be the period of time when the dragline was assembled ready for operation until the start of operations. Our daily reports fix these dates as April 1, 1998 to May 24, 1988. This period of 54 days corresponds closely to the delay noted by the Corps in its letter of May 11, 1998 (see Exhibit

---

[16] See Equipment Cost Schedule contained in Exhibit 33 (page 216).

3, page 75) and to the Construction Progress Chart for the contract.[17]

In the case of cells 3, 4, 5 & 6 the presence of the humus material delayed the start of work until the humus material could be stripped off. In cell 6 the excavation work started before all the humus material had been removed but then had to stop awaiting the complete removal of the remaining humus. We have determined the delay by moving the excavation quantities forward in time corresponding to the rate of production for that period or achieved when the work was actually performed. From this analysis we have determined that the excavation work would have been completed 186 days earlier but for the presence of the humus material.

In total we have found that at a minimum the total delay to the project was at least 273 days was lost due to the presence of humus material. We have therefore calculated the amount of delay for field overhead and home office overhead for the extended period of 273 days and have included these calculations. The field overhead cost of extension was found to be **$304,664.17 (see Exhibit 25, page 194)** and the home office cost based upon an Eichley calculation was found to be **$134,204.00 (see Exhibit 24, page 194)**.

In addition to these amounts, the delay at the start of the dragline operation meant that the 4600 dragline and its associated equipment was standing by during the period April 1, 1998 to May 24, 1998. We have determined the cost of stand-by during this period for the 4600 and its associated equipment to be **$21,721.60 (see Exhibit 23, page 192)**.

**Borrow Pit Preparation**

The work of Borrow Pit Preparation consists of building the perimeter dikes, ditching and dewatering, and construction of haul roads both at the borrow and at the levee. The presence of humus material meant that the building of the perimeter dikes, ditching and de-watering would take longer than anticipated. As a consequence there would be a corresponding increase in the number of equipment hours needed to perform these tasks. Moreover, the building of the haul roads was made considerable more difficult and at several locations required the construction of board roads in order to maintain access.

In Exhibit 19 (page 185) we have included photographs of our off road trucks used to haul material from the borrow area. In these photographs it can be seen that even this large specialized dual-wheel equipment has bogged down due to the soft nature of the surface material on the site. Each time these trucks bogged down it was necessary to rebuild the haul road and in some places

---

[17] Schedule progress at May 1, 1998 was 31.2% vs actual progress of 16.3%. See Construction Progress Chart contained in Exhibit 22 (page 191).

this meant that board roads had to be added.

The Corps recognized this problem early in the project and issued a modification to allow more time to construct the haul roads, but did not accept at that time the increased cost. Initially we thought that the presence of humus material was only local and that in time we would be able to get beyond the humus material. Eventually, our dikes began to fail and we were required to continue to rebuild them. The presence of the humus material at the foundation of the perimeter dikes however meant that they would continue to fail and these failures began in early April 1998 even before excavation began.[18]

When we compare our anticipated cost as shown in our bid document[19] with the actual cost incurred we find that we have incurred additional cost of **$325,117.82**.[20](The equipment cost contained in our bid has been adjusted to Corp of Engineers rates corresponding to the increased cost). This cost would not have been incurred but for the presence of the humus material which overlays the entire site thereby causing our haul road construction and dike construction to be more difficult not only to construct but to maintain as well.

**Increased Pumping Cost**

One of the first cost increases caused by the presence of humus material was the fact that the borrow would not drain as expected. This is because the humus material retains more moisture and takes longer to drain. As a result, throughout the contract period, we experienced an increased requirement in the number of pumps as well as in their operating hours. The total pumping cost incurred during the period of the contract is $80,110.97 as shown in Exhibit 34 (page 325) compared with the expected cost of $13,121.00 as shown in our bid document contained in Exhibit 36 (page 329). Thus the increased cost in pumping operations caused by the presence of humus material is **$64,417.22.**

**Dike Repair**

Throughout the period of the contract we were required to return again and again to repair dikes which had failed. During September and November 1998 the dikes failed completely due to high water. The extent of these failures would have been considerably less had they not been founded upon humus material. The failures which occurred during high water have been reimbursed, but the continual repair has not. In Exhibit 28 (page 199) we have included the cost

[18] See Exhibit 11 (page 98) Corps Daily Log #84 dated April 1, 1998

[19] See RACI original bid breakdown contained in Exhibit 36 (page 329).

[20] See RACI cost comparisons for Borrow Pit Preparation contained in Exhibit 26 (page 196).

recorded for repair of dikes in cells 2, 3, 4 and 6. The sum of these cost are in addition to the overrun of cost experienced on Borrow Pit Preparation listed above and amount to **$96,283.96**.

**Perimeter Dike Relocation**

In late July 1998 we were instructed by the Corps to relocate our dikes to the farthest edge of the right of way. The Corp argued that the drawing showed the perimeter dikes at the farthest edge of the right of way and therefore we were obligated to place the perimeter dikes at this location. This directive ignored the fact that the Corps regularly reviewed the position of the dikes as they were being placed and approved of their location. (See Exhibit 15, page 123). It also ignored the fact that when the dikes are constructed upon humus material the dike base will be quite extended due to the subsidence. In some cases, the base of the dike was as wide as the Right-Of-Way given us. The Corps argued that the slope failure which we experienced at cell 2 was caused by the fact that the perimeter dike was not constructed at the farthest point of the right of way. This argument ignores the fact that in April 1998 we had already experienced seven perimeter dike failures and in July had experienced four more failures. We complied with the directive to relocate the perimeter dikes and kept records of the cost of the relocation. The relocation did not however prevent the dikes from continuing to fail. The cost of relocating the perimeter dikes is included in Exhibit 27 (page 198) and amounts to **$9,528.18**.

**Cast Embankment**

As we have noted above, Cells 1, 2 and part of 3 were cast using a 4600 dragline. The humus material was not removed because the Corps accepted that when cast and moved, there would be sufficient mixing of the humus material with the remaining excavation. Consequently it was not necessary to remove the humus material before excavation could begin. This meant, however, that the 4600 dragline would have to operate on top of the humus material and to do this meant that at least two to three layers of matts would be needed to carry out the excavation instead of one. This doubling and tripling of matts meant that each time the 4600 had to move, the time needed was increased considerably because the lower matts had to be extracted from their imbedded position in the humus material.

The slowing of the dragline operations and the additional matts increased the cost of performing the cast embankment. The increased cost can be determined by comparing the production rate of the dragline in normal soil conditions present in a part of Cell 3 as opposed to the poor conditions present in Cells 1 & 2 together with the cost of the increased number of matts and extended duration see Exhibit 29 (page 202).

During the period beginning October 14, 1998 and December 18, 1998 the dragline worked in Cell 3 because the perimeter dikes had failed in Cell 2. The area in which the dragline operated

during this period was primarily CH material similar to that which was expected to be present though out the site based upon the contract soil borings. During this period, the dragline excavated 65,236 net section yards of material using 822 hours of operation. This production rate corresponds to 79.36 yards per hour of operation. During the remaining period, the dragline operated in Cell 1 & 2 producing 159,764 net section yards of material using 2584 hours of operation. This production corresponds to 61.82 yards per hour.

By comparison between these two rates of production which used the same equipment and the same operational personnel demonstrates that if the conditions within the borrow would have been as shown in the contract soil boring the loss of production of 17.54 yards per hour would not have occurred. This would have resulted in the excavation being performed in Cells 1 & 2 in 2013 hours instead of 2584 hours or saving of 571 hours. This corresponds to a savings of 28.5 working days based upon 20 hours per day and 33 calendar days. The increased cost is set out in a schedule contained in Exhibit 29 (page 202) and is **$201,574.87**.

**Hauled Embankment**

Cells 4, 5, & 6 and a part of 3 were all excavated and placed into off-road trucks for hauling to the levee. Consequently, all trucks which hauled material from these cells had to travel to and from the levee on haul roads which were constructed over the humus material. Operating on haul roads constructed over humus material often resulted in the roads pumping and bogging down the equipment . Retrieval of trucks was handled with dozers which pushed trucks to more solid soil area. This situation was more difficult at the entrance and exit of the individual borrows as these roads could not be adjusted laterally as they could elsewhere on the project.

Additionally, excavation within the borrow was confined to only the narrow areas which had the humus material removed. Consequently, operations within the borrow were restricted by the width of the borrow after the humus material was removed. In some cases this area was only wide enough for trucks to back into place rather than side loading in a circular pattern which is normal.

These limited conditions together with the soil conditions throughout the site meant that in order to transport the material it would be necessary to employ more off road trucks to handle the same amount of material as would have been necessary if the soil conditions on the site would have matched that given in the bid documents.

We have compared our estimated cost with the actual cost and found that the additional equipment and effort needed to haul the material to the levee to be $612,551.58 vs $1,354,330.79 for an overrun of **$433,583.22**. The cost incurred for uncompacted embankment hauled to the levee is contained in Exhibit 30 (page 203).

**Humus Removal**

In Cells 4, 5, 6 and a part of 3 the humus material was removed before excavation began. We have kept separate cost records of the cost incurred and these are contained in Exhibit 31(page 206). There the total cost for removal of the humus material is **$150,226.65**.

**Extra Mobilization Cost**

Due to the extra work and severe conditions encountered during the job it was necessary to increase the amount of equipment required to complete the work. The cost to mobilize this additional equipment to the job site is an extra cost. Exhibit 35 (page 326) contains a list of all equipment mobilized to the job site and RACI's cost of mobilization for each piece of equipment. The total cost for mobilization was calculated then the mobilization cost in the original contract was subtracted from the total to arrive at the Extra Mobilization Cost. The Extra Mobilization Cost is **$145,330.15.**

**Consultants**

As a result of the different site conditions we have had to hire experts to assist us with the formal evaluation of the soil conditions and to determine the cost impact of the humus material on our progress and cost. The cost of these consultants then is a direct result of the presence of humus material on the site and is included in our request for equitable adjustment. The amounts paid to the consultants is contained in Exhibit 32 (page 211) and is currently estimated to be **$143,949.94**.

**Summary**

We have demonstrated above that in the absence of the humus material we would have been able to complete the project 273 days earlier at a cost significantly below our actual cost and at a cost in line with our bid price. The basis of our calculation of increased cost relies upon a modified total cost approach because we are unable to demonstrate completely our production capability in the absence of the humus material. Even in Cell 3 where the ground conditions matched the contract soil borings we have still had to transport the excavated material over haul roads built over humus material. Consequently, we experienced the resulting pumping of the soil and the loss of production in our delivery systems. The increased cost requested by this request for equitable adjustment is **$2,404,685.53**.

***Certification***

"I hereby certify that the claim is made in good faith, that the supporting data are accurate and complete to the best of my knowledge and belief; and that the amount requested accurately reflects the contract adjustment for which the Contractor believes the Government is liable; and that I am duly authorized to bind the contractor with respect to the claim. This claim includes only costs for performing the alleged change, and does not include any costs which have already been reimbursed or which have been separately claimed. All indirect costs claimed are properly allocable to the alleged change in accordance with applicable acquisition regulations. I am aware that the submission of a false claim to the Government can result in the assessment of significant criminal and civil penalties and fines."

Ronald Adams, President

**Ronald Adams**
**CONTRACTOR, INC.**

1074 HIGHWAY ONE
THIBODAUX, LOUISIANA 70301
PHONE (504) 447-4466
FAX (504) 447-4546
LA Contractor's License No. 8579

September 21, 2000

Department of the Army
New Orleans District Corps of Engineers
P. O. Box 60267
New Orleans, LA 70160-0267

Attention: Mr. Chester Ashley

Re: Contract No. DACW29-97-C-0086
Westwego to Harvey Canal,
Hurricane Protection Levee
Orleans Village to Hwy. 45
First Enlargement
Jefferson Parish, LA
Unsuitable Material (humus)

Gentlemen:

Enclosed are two (2) copies of our Modification Proposal CIN 03 relative to matter in reference in the total amount of $2,725,377.90 inclusive of interest through September 30, 2000. Due to the size of the financial impact this matter has had on this company, we request your response to this proposal as soon as possible. We would be happy to meet with you to review the proposal.

Thank you for your prompt attention to this matter.

Sincerely yours,

RONALD ADAMS CONTRACTOR, INC.

Ronald J. Adams
President

RJA/eok

Enclosures

cc: Legal file

Contract DACW29-97
Westwego to Harvey Canal
Calculation of Interest

| | | | | | |
|---|---|---|---|---|---|
| otal cost per proposal | | | | | $2,531,800.64 |
| interest calculated through Sept 30, 2000 | | | | | |
| cost incurred Feb 99 thru Nov 99 | | | | $2,531,800.64 | |
| average cost expended 1999 | | | | $1,265,900.32 | |
| | | prompt payment rate | cost base | interest | |
| 4 mos. | jan - jun 99 | 5.00% | $1,265,900.32 | $21,098.34 | |
| 6 mos. | jul - dec 99 | 6.50% | $1,265,900.32 | $41,141.76 | |
| 6 mos. | jan - jun 00 | 6.75% | $2,531,800.64 | $85,448.27 | |
| 3 mos. | jul - sep 00 | 7.25% | $2,531,800.64 | $45,888.89 | $193,577.26 |
| | total cost of proposal | | | | $2,725,377.90 |

**Ronald Adams**
CONTRACTOR, INC.

1074 HIGHWAY ONE
THIBODAUX, LOUISIANA 70301
PHONE (504) 447-4466
FAX (504) 447-4546
LA Contractor's License No. 8579

December 7, 2000

Department of the Army
New Orleans District, Corps of Engineers
P. O. Box 60267
New Orleans, LA 70160-0267

Cert. No. 7099 3400 0007 7731 9336

Attention: Mr. Domingo Elquezabal

Re: Contract No. DACW29-97-C-0086
Westwego to Harvey Canal, HPL
Orleans Village to Hwy. 45
First Enlargement, Jefferson Parish, LA
Unsuitable Material (Humus)

Gentlemen:

On September 21, 2000, we submitted our Modification Proposal CIN-03 relative to the matter in reference. To date we have received no response. Since over 60 days have elapsed since our submission, we can only conclude your rejection of our proposal in its entirety.

Therefore, we now consider this proposal as a claim and, accordingly, include our claim certification. Please consider this as our request for a Final Contracting Officer's Decision.

Sincerely yours,

RONALD ADAMS CONTRACTOR, INC.

Ronald J. Adams
President

RJA/eok

Enclosures

cc: B97050 Claim file

.S. Postal Service
ERTIFIED MAIL RECEIPT
omestic Mail Only; No Insurance Coverage Provided)

Sent To
R. Chestee Ashley

| | |
|---|---|
| Postage | $ .55 |
| Certified Fee | 1.40 |
| turn Receipt Fee (ement Required) | 1.25 |
| ted Delivery Fee (ement Required) | |
| ostage & Fees | $ 3.20 |

Postmark
USPS
DEC - 8 2000
THIBODAUX LA 70301

ease Print Clearly (to be completed by mailer)
ps of Eng., New Orleans Dist.
t. No.; or PO Box No.
Box 60267
State, ZIP
Orleans, LA 701..

We construc ... t.

ALL-STATE LEGAL
EXHIBIT
"B"

RE: Contract No. DACW29-97-C-0086
Westwego to Harvey Canal
Hurricane Protection Levee
Orleans Village to Hwy. 45
First Enlargement, Jefferson Parish, LA
Unsuitable Material (humus)
RACI Letter dated September 21, 2000

*Certification*

"I hereby certify that the claim is made in good faith, that the supporting data are accurate and complete to the best of my knowledge and belief; and that the amount requested accurately reflects the contract adjustment for which the Contractor believes the Government is liable; and that I am duly authorized to bind the contractor with respect to the claim. This claim includes only costs for performing the alleged change, and does not include any costs which have already been reimbursed or which have been separately claimed. All indirect costs claimed are properly allocable to the alleged change in accordance with applicable acquisition regulations. I am aware that the submission of a false claim to the Government can result in the assessment of significant criminal and civil penalties and fines."

Ronald Adams, President