IN THE UNITED STATES COURT OF FEDERAL CLAIMS

WASHINGTON, D.C.

RONALD ADAMS CONTRACTOR, )
INC. )
) CIVIL ACTION
VS. ) NO. 03-2771C
)
UNITED STATES OF AMERICA )

*******************************************************

ORAL DEPOSITION OF

CHESTER ASHLEY

SEPTEMBER 19, 2006

VOLUME 1

*******************************************************

ORAL DEPOSITION OF CHESTER ASHLEY, produced as a witness at the instance of the PLAINTIFF, and duly sworn, was taken in the above-styled and numbered cause on the 19th day of September, 2006, from 9:03 a.m. to 10:38 a.m., before B. Irene Meguess, RPR, Louisiana CCR No. 95014, reported by machine shorthand, at the offices of the U.S. Army Corps of Engineers, 7400 Leake Street, New Orleans, Louisiana, pursuant to the Federal Rules of Civil Procedure and the provisions stated on the record.

EXHIBIT "A"

material and working on the unsuitable material, you would expect him to include that in his modification request?

A. If that was material -- if that equipment -- if I determined that equipment was necessary to do the change worked, yes.

Q. Then that would be compensable?

A. Yes.

MR. ABERNETHY: Let's have that letter of March 6, 2001, marked as Exhibit 2.

(EXHIBIT ASHLEY NO. 2 WAS MARKED)

Q. (BY MR. ABERNETHY) Next, Mr. Ashley, is an August 16, 1999, letter that I think you wrote to Ronald Adams and it is discussing that same issue of materials and suitable versus unsuitable. And you say in the second paragraph there: I informed you that a contract modification for the removal of the unsuitable material in the borrow pit would be issued under the contract clause - changes.

Do you remember that being your position on this job?

A. Yes.

Q. And when you say that a modification would be issued, that means you had already decided entitlement in favor of the contractor; is that right?

A. That's correct.

Q. And you were waiting on the contractor's cost proposal to decide quantum; is that right?

A. That's correct.

Q. You had recognized that there was some cost involved, or you wouldn't have asked for a proposal; is that right?

A. That's correct.

Q. But you didn't know at this point how much?

A. Correct.

Q. And you refer in that paragraph at the end to another contract, another project; and it says: You submitted a proposal in a timely manner on that project, negotiations were held promptly and a satisfactory price adjustment, including the cost of all impacts was agreed upon.

Do you remember what you were talking about there?

A. I think -- from memory, I don't; but from reading the letter, you know, we had a similar contract in the same area, which I think I referred to earlier with Ronald Adams, that had similar -- had unsuitable material in the pits also.

Q. So, you were suggesting in this letter that Ronald Adams do the same thing here; and that is,

determine all the cost impacts due to the unsuitable material and submit your cost?

A. That's correct.

Q. Now, when you say it comes under the "contract clause - changes," what exactly did you consider to be the change?

A. The contract itself referenced unsuitable material; however, as we referred to earlier, it did not have a payment vehicle in the contract to pay for the removal of this unsuitable material. So, that was the change to the contract, to pay for the unsuitable material.

Q. The only thing the contract said about unsuitable was to define it -- right -- say it can't be used?

A. I don't know if that is all it said. It did say that. Sometimes the contract said, you know, that an equitable adjustment be made under the changes clause for unsuitable material removal. I'm not sure if this one did or not.

Q. To your recollection, this one didn't say: Expect unsuitable material in any particular area?

A. No.

Q. But, in fact, you hit it in the borrow pits; is that right?

A. That's correct.

Q. Was there also unsuitable at the levee face?

A. Not that I'm aware of.

Q. Now, the impacts you're talking about there, you were referring to impacts on this prior job that were included in a modification. Based on your experience, the impact of unsuitable material can vary from job to job, can't it?

A. Yes.

Q. Depends on how deep it is; that's one factor?

A. Yes.

Q. It would depend on how widespread it is over the borrow pits?

A. Correct.

Q. You would expect the impact to be evaluated case by case and decided on that particular project; is that right?

A. I would expect impacts to be evaluated, yes, and submitted as a part of the cost proposal.

MR. ABERNETHY: Let me have that letter marked as Exhibit 3 to your deposition.

(EXHIBIT ASHLEY NO. 3 WAS MARKED)

Q. (BY MR. ABERNETHY) Do you have -- in your mind do you have any method that you normally favor in deciding what the cost of an unsuitable impact is?

condition -- subsurface soil conditions on projects?

A. Not -- I normally rely on geotech people in the engineering division to do any technical evaluation of material classifications.

Q. If the contractor on one of your jobs said, "I've got a differing site condition," is that something you would investigate or would you get somebody in geotech?

A. We would normally ask geotech to get involved.

Q. You probably remember on this project there is correspondence going back and forth with Ronald Adams saying we've got a differing site condition and you saying, "Well, we're going to pay you under the changes clause."

Tell me in your experience what difference it makes whether you handle the mod under the changes clause or whether you handle it under the differing site condition clause.

A. I don't know that it makes any difference as to what's the final outcome as far as quantum.

Q. Why was it your preference here to handle it under the changes clause, as opposed to the differing site condition clause?

A. It was a change to the contract, not a differing site.

Q. But a differing site condition can also be a change to the contract, can't it?

A. Yes. Again, as I said earlier, this was based not on a geotechical evaluation; it was based on a visual observation of the material at the site in determining that the top part of the -- top layer of the material was not suitable for levee construction and the contract addresses not using unsuitable material in the contract. So, that's why I thought it rightly belonged under the changes clause to address.

Q. That was just a judgment call on your part as to how to designate it?

A. I think it is based on my years of experience as a, you know, administrative contracting officer and contract administrator, that was the correct way to address this particular issue.

Q. And if you called -- under the changes clause, your office could make that decision without getting involved in geotech and engineering?

A. No, it had nothing to do with -- if it was a different site condition, I would have done subsurface and did borings and things like that, whereas if it was unsuitable material, that -- the contract explained what suitable material was and based on experience we knew what unsuitable material was. And so, we did not want

that in the levee construction. So, that was the reason for requesting that the contractor not place that in the levee under the changes clause.

Q. But on this job, it could have been under the changes clause or the differing site condition; and you don't think it would have made any difference in the pricing of it or the way it was analyzed costwise?

A. I can't see any reason why it would have been any different.

Q. Everybody's heard all the publicity lately about levees in the New Orleans area. Is it important to you, based on your experience, that unsuitable material not be put in levees?

A. That's correct.

Q. Critical?

A. Critical, yes.

Q. You would insist that no unsuitable material ever be put in a levee, wouldn't you?

A. Yes.

Q. You would expect your field people to do the same?

A. Absolutely.

Q. What about suitable material, is it also important that the contractor use all the suitable material and not discard it?